Atlanta Concrete Pipe Co. v. Commissioner.
Atlanta Concrete Pipe Co. v. Commissioner
Docket No. 112612.
United States Tax Court
1943 Tax Ct. Memo LEXIS 100; 2 T.C.M. (CCH) 831; T.C.M. (RIA) 43437; September 24, 1943
*100 Sidney J. Hayles, C.P.A., 831 Citizens & Southern Nat. Bank Bldg., Atlanta, Ga., for the petitioner. J. Marvin Kelley, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves income taxes for the fiscal year ended March 31, 1939, in the amount of $614.87, the amount of the deficiency determined; and for the fiscal year ended March 31, 1940, in the amount of $694.83, the amount of the deficiency determined. Two questions are presented, first, the reasonableness of a salary paid the petitioner's president, and, second, whether the Commissioner erred in disallowing automobile expenses. Findings of Fact The petitioner is a corporation having its principal place of business in Atlanta, Georgia, and engaged since its organization in the business of manufacturing and selling concrete pipe, storm sewers and sanitary sewers. During the taxable years it employed about 35 people. It was organized in April, 1937. The then stockholders were: J. G. Kyle owned 40 shares; Besse M. Kyle, 40 shares, and J. V. Kyle, 10 shares. J. G. Kyle was first president and general manager of petitioner, and served until September 9, 1937, the date of his death. *101 He was the husband of Besse M. Kyle. J. V. Kyle was his younger brother, aged about 24 years in 1937. J. G. Kyle, before the organization of the petitioner, had been president of the Ohio Valley Concrete Pipe Co. and later a manager of a partnership, the J. G. Kyle Co. of Atlanta, Georgia. His compensation had been $10,000 a year. He was not a graduate engineer. He had been in the pipe business since 1926. Besse M. Kyle, who was 46 years of age at the time of the trial, had a college course in science, mathematics, etc., with a degree from Iowa College. She started a business career in 1922 and entered the concrete pipe business in 1927. She had been a director and officer of the Ohio Valley Concrete Pipe Co., and attended meetings deciding policies. She was in the employ of Sherman Concrete Pipe Co. from about 1927 to 1933, in charge of the office and the books, the routing of shipments and handling quotations on the product. Prior to her connection with the petitioner, her greatest income per year had been slightly in excess of $5,000. She had worked with newspapers, and after her marriage, with concrete companies. Upon the death of her husband, J. G. Kyle, Besse M. Kyle inherited *102 his 40 shares of stock in the petitioner, after which the stock was held 80 shares by Besse M. Kyle and 10 shares by J. V. Kyle. She then became, and has since remained, president and treasurer of the petitioner corporation, and during the taxable years dictated the policies of the petitioner, was responsible for its failure or success, and had control of all of its affairs, including the acceptance or rejection of contracts. She traveled extensively in the interests of the company. She gave all of her time to the business. The gross sales of the petitioner for the taxable years were as follows: For the year ended March 31, 1939, $198,241.97; for the year ended March 31, 1940, $136,080.14. The annual income, after deducting cost of goods sold and including discounts received, was $52,332.78 and $42,938.90, respectively, in the two years. These figures are before deducting office expenses or salaries. J. V. Kyle was made secretary and general manager of the corporation, and so served during the taxable years. His duties were largely those of quotation of prices, selling, promoting and making estimates. He secured new contracts. He had been in the concrete business from six months *103 to a year prior to his brother's death. On May 2, 1938, the board of directors of the petitioner fixed the following salaries: Besse M. Kyle, $5,000; J. V. Kyle, $4,000, and W. H. Kimbrough, $2,400 for the fiscal year ended March 31, 1939. W. H. Kimbrough was a salesman and vice president. On March 6, 1939, prior to the end of that fiscal year, the board of directors increased the salaries of Besse M. Kyle to $10,000 and J. V. Kyle to $7,500. The salary of W. H. Kimbrough was not increased. He became ill and was unable to do the work he had formerly done, and there were months at a time when he was not able to work. He had a stroke. Even earlier it was necessary to hire a chauffeur for him. His work was made as light as possible. Since then he has been incapacitated part of the time. At the time of the trial he had been on sick leave for nine months on full pay, and was still in the employ of the company. The minutes authorizing the increase of salaries recite "that the Company was experiencing a very successful year due to the efforts of its officers." On July 6, 1939, the directors of the corporation fixed salaries for the year ended March 31, 1940, as follows: Besse M. Kyle, $5,000, *104 J. V. Kyle, $4,000, and W. H. Kimbrough, $2,400; but on February 26, 1940, the board of directors again reciting inter alia, "that the Company was experiencing a very successful year due to the efforts of its officers," fixed the salaries as follows: Besse M. Kyle, $10,000; J. V. Kyle, $7,500; the salary of W. H. Kimbrough was not increased. The petitioner's plant was subject to a mortgage on March 31, 1939, amounting to $48,000. Twelve months later it had been reduced to $22,000. The indebtedness of the company, aside from interest and taxes at the beginning of the taxable year ended March 31, 1939, had been $63,000. The question of dividends was discussed between J. G. Kyle and Besse M. Kyle. There was a desire to pay the mortgage as soon as possible, although it only had to be reduced $6,000 per year. It was felt that if the dividends were taken down they would be unable to keep up the mortgage payments. No dividends were paid during either of the taxable years. Up to December 31, 1938, the petitioner owned two automobiles. These were used by W. H. Kimbrough and J. V. Kyle for both business purposes and personal use, including going to and from work. Up to the same date, *105 Besse M. Kyle owned an automobile which was used for her personal use and was used by the petitioner for business purposes. On that date she sold the car to the petitioner, and thereafter all three cars were both for business purposes and for the personal use of the three officers of the corporation. The car owned by Besse M. Kyle cost her $1,209. No depreciation on it was charge by her against the company up to December, 1938. Because of the bad abrasive effect of concrete dust upon the cars, it was not practical to store cars at the petitioner's plant, and it had no facilities for storing them. The cars were stored at home and no charges were made for such storage. The following expenses were incurred upon the cars and deducted in the income tax returns of the petitioner as follows: Amount
Amount
Year
Deducted
Disallowed
Ended March 31, 1939
$ 657.15
$391.91
Ended March 31, 1940
1,357.30
663.50 These figures of expense were exclusive of amounts included in the expense account of the salesman, W. H. Kimbrough, who used the greater part of the gasoline which was charged to the account. The major portion of the amounts deducted was paid to filling stations, garages, *106 and repair shops. Besse M. Kyle drove her car very little for personal use; W. H. Kimbrough did nothing but work; and the record does not indicate how much J. V. Kyle drove his automobile for personal use. For the taxable year ended March 31, 1939, petitioner deducted in its income tax return $4,596.55 as "Traveling Expense & Auto Allowance." This is in addition to "Depreciation, Autos." For the Fiscal year ended March 31, 1940, deduction of $6,165.55 is claimed under the heading "Traveling Expense," in addition to "Insurance, Autos," $142.91; and "Depreciation, Autos." $760.38. The respondent disallowed "Automobile expenses" of $391.91 and $663.50 in the respective years. Opinion We first consider the question as to whether the respondent erred in reducing the salary of the petitioner's president, Besse M. Kyle, from $10,000 to $6,000 per year. Although the burden is, of course, upon the petitioner to show there was such error and although the salary had been fixed at a lower figure, near the beginning of each of the taxable years, and raised near the end of each year, nevertheless, we think that we would be unjustified in disapproving the $10,000 salary paid. The respondent does *107 not contend that the salaries were in proportion to the amount of stock held. No dividends were paid, the explanation given being that a mortgage was upon the property and it was desired to reduce the mortgage as rapidly as possible, in effect, instead of paying dividends. Amounts, which were large in comparison with the net income of the corporation, were in fact paid upon the mortgage. Though the respondent argues that no showing is made of salaries as compared with other corporations, we think a true comparative was established in that J. G. Kyle, who preceded Besse M. Kyle as president of the petitioner, had in previous employment received $10,000 per year. The petitioner's president, although a woman, was shown to have long and responsible experience in the concrete business. Upon the death of her husband, she took charge of the business, controlled it, and was responsible for all of its policies. Under her policies, the taxable years were successful business years. She traveled widely on the company's business and handled all of its fiscal matters, and decided the acceptance or rejection of contracts. We do not think this is a case of paying salaries disproportionate to value, *108 merely to avoid dividends. The money could have been paid upon the mortgage on the property, as was done with most of the other income. Though the salary of one officer, W. H. Kimbrough, the vice president, was not increased, and though he was not a stockholder, the record shows that Kimbrough was, after a "stroke," in poor health, incapacitated for work "for months at a time." Since at the time of trial he was still in the employ of the company at full pay, though on sick leave for the last nine months, we can not but believe that had he not been ill, his salary would have been increased commensurate with others. We conclude and hold that the Commissioner erred in disallowing the full $10,000 deducted for salary of petitioner's president. On the question of automobile expense, the automobiles were used both for business purposes and, to some extent at least, for the personal use of the three officers. No allocation in any degree definite is made of the expense between personal use and use by the corporation, and particularly as to J. V. Kyle, the record is silent as to how much personal use he gave the automobiles. The petitioner claimed upon its income tax returns deduction of *109 $4,596.55 as "Traveling Expense & Auto Allowance," for the year ended March 31, 1939, and under the heading of "Traveling Expense" claimed a deduction of $6,165.55 for the year ended March 31, 1940. Although the evidence is that "exclusive of the amount included in the expense account of the salesman, Mr. Kimbrough," the amounts spent for the use of the automobiles in the respective years was $657.15 and $1,357.30, it is apparent that, considering the exception as to W. H. Kimbrough's use of the cars, the record does not establish that only $657.15 and $1,357.30, respectively, were spent on automobiles, and does not explain the much larger deductions shown on the returns. This leaves a decidedly indefinite record. Considering the fact that the respondent disallowed automobile expense for the respective years of only $391.91 and $663.50, a comparatively small percentage of the entire amount of expense for travel, we think it clear that the petitioner has not met its burden of showing error in this regard. We so hold. Decision will be entered under Rule 50.